JOURNAL ENTRY AND OPINION
Defendant-appellant David Williams appeals from his conviction for two counts of rape in violation of R.C. 2907.02 and twenty counts of gross sexual imposition in violation of R.C. 2907.06. The appellant was sentenced to a term of seven years incarceration on each count of rape, to be served consecutively. On each count of gross sexual imposition, the appellant was sentenced to a one-year term of incarceration, each to be served concurrently with each other and with the sentences for rape.
When David Williams moved in with Videllia Coleman and her six children, the two eldest daughters, Tina Giles and Videllia Giles, were approximately nine years and eight, respectively. At the time of her testimony, Tina Giles was nineteen. The appellant began touching Ms. Giles inappropriately when she was ten years old and the abuse ended four months before she left her home in March 1997. The appellant repeatedly touched her vagina, her buttocks, and her chest. He did this when no one else was in the room and did so almost every time there was an opportunity. Ms. Giles informed her mother of these occurrences. Ms. Coleman would fight with the appellant, but he would deny the allegations. Her mother would then become angry with her, calling her a liar. These acts occurred more than ten times (T. 23). She observed the appellant treating her sister Videllia in the same manner (T. 20, 27).
Ms. Giles also testified regarding the physical abuse meted out by the appellant. When the appellant would find the telephone number of boys amongst her possessions, he would beat her with an extension cord or VCR cord. During the beatings she was tied up and wearing only her underwear. Once she was beaten so badly that she had blood inside her eyes. Her mother left the house during the beating (T. 64).
Ms. Giles testified that once, when she was seventeen, while her mother was visiting her grandmother in the hospital, the appellant forcibly pulled down her pants and inserted his tongue into her vagina (T. 21-22). She kept screaming for him to stop, but he replied "I'm only gon' do it once." (T. 21-22.) Ms. Giles kept pushing him back, but he would not stop. When she told her mother, her mother and the appellant argued for a while. No further action was taken.
Ms. Giles testified that at one point the appellant and her mother believed that she had failed to bring home her progress reports from school. The appellant punched her in the face (T. 23). Because they believed her hair to be her "pride and joy," her mother, with the assistance of the appellant, cut off her hair as punishment (T. 25). Another time, the appellant found her diary full of poetry about love. The diary also contained telephone numbers of boys and poems written to her by boys. The appellant `tied her up like a hog' and beat her with a belt, the extension cord and a VCR cord (T. 26). Her feet, legs and arms were tied together (T. 27)
After this incident, Ms. Giles left her mother's home and stayed with a friend. Two days later, on March 12, 1997, she contacted the police. Ms. Giles was scared because the appellant was driving around and looking for her. He set fire to a car in a parking lot where she was staying (T. 27).
During cross-examination, a portrait of an abused and troubled child was revealed. Ms. Giles admitted to being an habitual liar. She had made it only to the eleventh grade at South High School. She had attended Jane Adams High School, but was kicked out (T. 51). She had also attended East High, but her mother and the appellant had her transferred because she was cutting classes and failing. She spent her time running around inside the school building with a "whole bunch of girls" (T. 34). Ms. Giles told only one of her friends that she was abused at home, Erica Gilbert, a new friend she made at South High.
Ms. Giles did testify that the appellant controlled her mother, whatever he said to do, she did (T. 38, 39). The beatings were administered by the appellant, but her mother was present. There were times when they were bruised from the beatings that the appellant and her mother would not let them go to school (T. 43). The beatings occurred for small infractions of the rules, such as not washing the dishes the way the appellant wanted. Her mother began to beat them only when the appellant told her mother that she was not beating the children enough. The appellant did not really care about her grades, he only cared about the boys she knew. Ms. Giles did not inform her physician of the abuse.
On direct examination, Ms. Giles was asked when her older brother Charles moved out of the home. He left two days before he turned eighteen (T. 17). On cross-examination, Ms. Giles was asked more probing questions regarding the involvement of the Department of Human Services (DHS). The social worker interviewed her only once when she was fifteen or sixteen (T. 40). Ms. Giles did not tell the social worker about the violence and abuse occurring in the home. Ms. Giles testified that it was not her mother who was beating Charles, but rather it was the appellant who actually broke Charles' nose. Her mother then "finished him off with a baseball bat." (T. 46.)
Ms. Videllia Giles testified that the appellant abused her as well. At the time of the trial, she was living with a paternal great aunt and attending the twelfth grade at Glenville High School. As she remembers, the abuse began when she was approximately seven years old. She was told to clean behind the old couch so that the new couch could be placed in the livingroom. When she was behind the old couch the appellant began to grab her buttocks and her breasts (T. 74).
Videllia Giles was about ten when the appellant started to ask her to rub his feet and back and to massage his buttocks. He would then made her stick her hands in his underwear and grab his penis (T. 75). At times he would ask her if she wanted candy. If she answered in the affirmative, she would have to give him a hug and kiss. The kiss was on the mouth and during the kiss he would grab her buttocks and chest (T. 75).
Ms. Videllia Giles observed the appellant abuse her sister Tina in a similar manner. Tina was also directed to clean behind the old couch and while she was behind the couch, the appellant grabbed Tina's breasts and buttocks. Videllia Giles and Tina Giles shared a bedroom. One night, from the top bunk, Videllia observed the appellant enter the room and grope Tina, who was on the bottom bunk.
At the age of fourteen Videllia Giles informed her mother of the appellant's abuse. Her mother did not believe her, but asked the appellant. The appellant assured Ms. Coleman that he was sorry, that he did not mean to do it, and that it would never happen again (T. 77). Ms. Coleman and the appellant argued, but in the end he stayed with the family (T. 78).
Ms. Giles testified that the appellant grabbed her breasts, buttocks, and vagina more than ten times (T. 80). One day, when she was fourteen or fifteen, she was watching Captain Planet on television. She was lying on the floor, watching television. The appellant walked into her bedroom and laid down on top of her. He then pulled down her pants and panties and started licking her vagina (T. 81). She told the appellant she did not like it, but he forced himself on her.
Ms. Videllia Giles also testified as to the circumstances under which she was vaginally raped by the appellant. As a reward for a good progress report, the appellant gave Videllia Giles a camera. Later that day, he asked her to come into her mother's room. During her testimony, Videllia revealed: "And he told me to pull down my pants, my panties and then he put me on my mother (sic) bed and put my feet behind my head and poked his penis in my vagina. He ejaculated and wiped it off with a towel and then he sent me in my room to go to bed." (T. 83.)
During that same year, at some point when she was in trouble for something, the appellant asked her if she wanted a whipping. He then stated "You can't take the pain, can you?" (T. 83.) She said no. He ordered her to take off her clothing so that she could be whipped. He then pulled down her panties and poked his penis in between her buttocks and ejaculated (T. 83). On three or four subsequent occasions the appellant would rub his penis against her buttocks until he ejaculated (T. 84). There was never any penetration on these occasions.
Additionally, Videllia Giles gave testimony as to physical abuse she suffered at the appellant's hands. As a punishment the appellant would make her take off all of her clothing and whip her with a belt or cable cord. He would tie her hands, arms, and legs and whip her on the floor while she was naked. Next, he would make her ride the exercise bicycle for hours holding weights over her head (T. 86). Finally, the appellant would make her get in the bathtub filled with bleach and hot water.
Videllia Giles testified as to the abuse suffered by her sister Tina. On various occasions the appellant tore the clothes off of her sister; he struck Tina in the face; he read her diary and then threw it into the garbage; subjected her to the punishment of riding the stationary bicycle with weights over her head; and he cut off Tina's hair as a way to hurt her. Ms. Coleman and the appellant threatened to cut the hair of all of the girls. Videllia, just like her sister, did not tell outsiders such as friends or her family physician about the abuse. Sometimes her mother was present during the beatings, and sometimes she went to a friend's house (T. 123).
On June 4, 1997, Videllia Giles and her younger sister Eshaqa fled to Safe Space, a short-term crisis shelter for runaway children and teenagers. Eshaqa was fourteen and wished to go with Videllia. Leaving home was precipitated by the appellant setting fire to a car where Tina was staying (T. 91). The appellant threatened the children that should they act as Tina had, he would "do some things" (T. 91). He issued threats and instructed them not to tell anyone.
At Safe Space, Videllia spoke with Ms. Halle Thombs. Eventually, she informed Ms. Thombs of the physical and sexual abuse she suffered at home. She then spoke with the social worker from Children's Services. At a meeting with Ms. Thombs, the social worker, Ms. Coleman and the appellant, her mother called her a liar and said: "I don't need her anyway. She could stay where she at." (T. 92.) Eshaqa returned home.
Ms. Videllia Giles admitted that she ran away from her first foster home placement. She is now in another foster home. Videllia Giles testified that when she made her police statement, June 20, 1997, she was unaware that Tina had also filed a report.
Ms. Giles also testified as to the effect this abuse has had on her life. She does not dress up as a girl, she does not wear skirts and dresses, but rather wears pants. She is scared to walk around at night, she sleeps next to the wall so no one can touch her, she is scared to have any male touch her, and is scared to have sex (T. 136). When her mother chose the appellant over her, it hurt her.
The state presented the testimony of both Halle Thombs, from Safe Space, and Lawrence Petrus, from the Cuyahoga County Department of Children and Family Services (CCDCFS). Ms. Thombs, M.S.W., was the youth advocate at Safe Space who spoke with Videllia Giles on June 6, 1997. Safe Space contacted the police on behalf of Videllia and subsequently she made a statement. Ms. Coleman was notified that her daughter was at the shelter. The appellant accompanied Ms. Coleman to a meeting at the shelter. At the meeting, the issues raised by Videllia Giles were put aside while the appellant and Ms. Coleman concentrated on what it was that Videllia was doing wrong. Videllia Giles spent much time crying at the meeting.
Mr. Petrus testified that he received a referral for Videllia Giles for alleged physical and sexual abuse. When he interviewed her at Safe Space, he inquired as to whether or not she was willing to make a police report. Videllia indicated that she was willing and Petrus instructed Safe Space to call the Cleveland Police Department. During her interview with Mr. Petrus, Videllia was visibly upset and the tears were flowing (T. 164).
A staffing was held by CCDCFS in order to determine the next course of action. Present was the appellant, Ms. Coleman, the supervisor, a staffing facilitator, and the next social worker to receive the case, and Mr. Petrus. Ms. Coleman stated that she did not believe her daughter and the appellant became loud and defensive. Ms. Coleman stated that the appellant did not abuse the children, but admitted to making the girls ride the exercise bicycle with weights over their heads. Petrus also spoke with Eshaqa who corroborated the allegations of abuse made by Videllia. He tried to locate Tina, but was unable to find her. The result of the staffing was a finding that Videllia might not be safe in her home. A complaint was filed at Juvenile Court for custody.
The appellant testified on his own behalf that he never, at any time, abused, either sexually or physically, Tina Giles or Videllia Giles. Videllia Coleman, mother of the victims, testified on behalf of her boyfriend that her daughters were "bald faced liars" who refused to follow the rules of her home.
The appellant sets forth three assignments of error. The first and second assignments of error will be considered together.
The appellant's first assignment of error:
 DAVID WILLIAMS WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL BEFORE AN IMPARTIAL JURY BY THE REPEATED ADMISSION OF EVIDENCE CONCERNING OTHER ALLEGED BAD ACTS COMMITTED BY MR. WILLIAMS WITH WHICH HE HAD NOT BEEN INDICTED AND WAS NOT ON TRIAL.
The appellant's second assignment of error:
 DAVID WILLIAMS WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BY TRIAL COUNSEL'S FAILURE TO OBJECT TO THE REPEATED OTHER ACTS TESTIMONY THAT WAS ADDUCED DURING THE STATE'S CASE.
In the first assignment of error, the appellant argues that the trial court erred in permitting the state to question witnesses regarding the alleged physical abuse of Tina Giles and Videllia Giles. The appellant also takes issue with the admission of testimony that he set fire to a motor vehicle. The appellant points out that he was not charged with assault, child abuse, child endangering or arson. In the second assignment of error, the appellant argues that he was rendered ineffective assistance of counsel through counsel's failure to object to the admission of the above-referenced evidence.
A review of the record demonstrates that the appellant's trial counsel failed to object to the admission of this evidence. Absent an objection, error in the admission of this evidence is waived. State v. Wilson (1982), 8 Ohio App.3d 216. Assumingarguendo, that the admission of this evidence was plain error, this court will proceed with the analysis.
Evid.R. 404 (B) provides that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. See also R.C. 2945.59. To be relevant, the other acts evidence must form a part of the immediate background of the alleged act and be close enough in time to form a foundation for the crime charged. State v. Curry
(1975), 43 Ohio St.2d 66. The admission or exclusion of relevant evidence is within the sound discretion of the trial court. Statev. Combs (1991), 62 Ohio St.3d 278.
Courts have held that evidence of physical, emotional, and verbal abuse which transpire in a home between the abuser and the victims may be relevant and probative of a method of control used to force sex upon the victims, and is inextricably related to the charge of rape and gross sexual imposition. State v. Martin (Dec. 6, 1990), Cuyahoga App. No. 58648, unreported; State v. Black
(February 10, 1994), Cuyahoga App. No. 64686, unreported; Statev. Sexton (March 9, 1998), Stark App. Nos. 1996CA00306, 1006CA00367, unreported.
In the case sub judice, the admission of evidence at trial of the appellant's physical and psychological abuse of the victims, and his attempts at intimidation, were within the discretion of the trial court. The pattern of abuse for both young women was the same, and given that the appellant made the victims strip to their underwear and then beat them with cords, the abuse and intimidation were inextricably intertwined with the charges of rape and gross sexual imposition.
Turning to the appellant's second assignment of error, the appellant asserts that defense counsel's failure to object to the other acts evidence was deficient and prejudicial.
Ineffective assistance claims are evaluated in a two-step process. First, the defendant must show that counsel's representation fell below an objective standard of reasonableness. State v. Keenan (1998), 81 Ohio St.3d 133, 152, citing to Strickland v. Washington (1984), 466 U.S. 668, 688. Second, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. See alsoState v. Davie (1997), 80 Ohio St.3d 311, 331 and State v.Reynolds (1997), 80 Ohio St.3d 670, 674. There is a strong presumption that licensed attorneys are competent and that the challenged action is the product of sound trial strategy. Statev. Hamblin (1988), 37 Ohio St.3d 153. Even debatable tactics do not constitute ineffective assistance of trial counsel, for it is obvious that nothing is seen more clearly than with hindsight.State v. Clayton (1980), 62 Ohio St.2d 45, 49. A reviewing court must evaluate trial counsel's performance on the facts of the particular case as of the time of counsel's conduct. Strickland,supra.
In the first assignment of error, the evidence of the appellant's physical and emotional abuse and attempts at intimidation were held to be admissible. Since the evidence was properly admissible, counsel's failure to object was not prejudicial. The appellant was not rendered ineffective assistance of counsel. See, Black, supra.
The appellant's first and second assignments of error are overruled.
The appellant's third assignment of error:
 DAVID WILLIAMS' CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
The appellant asserts that his conviction was against the manifest weight of the evidence because the victims are liars whose testimony is not worthy of credence. The appellant also argues that there is no corroborative evidence.
In State v. Thompkins (1997), 78 Ohio St.3d 380, the Supreme Court illuminated its test for manifest weight of the evidence by citing to Black's Law Dictionary (6 Ed. 1990) at 1594:
 Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."
Thus, as the concurring opinion noted, when deciding whether a conviction is against the manifest weight of the evidence, an appellate court determines whether the state has appropriately carried its burden of persuasion. The only special deference given in a manifest weight review attaches to the conclusion reached by the trier of fact. Thompkins (Cook, J., concurring) citing to State v. DeHass (1967), 10 Ohio St.2d 230.
As the state in its brief points out, the appellant overlooks the fact that the victims corroborate each other's testimony. The jury heard the admission by both victims that they are liars and the jury heard Ms. Coleman, their mother, issue the same opinion about her daughters. The jury was quite capable of determining when the truth was being told and by whom. Unlike the appellant, the jury obviously thought it was the victims' testimony which was worthy of belief.
The appellant's third assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANN DYKE, P.J., and MICHAEL J. CORRIGAN, J., CONCUR.
 ___________________________________ JAMES D. SWEENEY JUDGE